PIERSON
*v.*
THOMPSON.

PIERSON and others *vs.* THOMPSON and others.

Where A. is mortgagee and trustee for creditors and buys in the real estate (mortgaged to him) in his own name, but voluntarily for the benefit of the trust and afterwards allows a re-sale for the like purpose, (subject to his just charges and expenses) and the amount is credited to the trust fund, he cannot retract; especially as the debt owing to him *from* the trust estate had been satisfied. It has become trust property.

Where real estate is conveyed for the benefit of creditors and an equity of redemption, embraced by the deed, is sold under an execution, but the judgment creditor ceases to claim the avails of the sale, they belong to the trustees and not to the administrator of the debtor.

A trustee cannot charge the trust estate with the costs of defending actions of assault and battery recovered against him, although the acts arose in an attempt to protect the trust property.

If a servant or agent commits a trespass ignorantly, upon an express promise of indemnity, the promise may be enforced; but if the wrong-doer knows the act to be unlawful, he can never enforce the promise.

Where certain persons were to subscribe for a large amount of stock and hold it upon trusts afterwards declared, and they became trustees for the creditors of the person beneficially interested: *Held*, they could not charge commissions upon the stock either as trustees or special agents.

Where trustees make a heavy sacrifice which is deemed expedient at the time, they are not liable to make good the loss.

*December* 1,
· 1831.

*Trust.*
*Trustee.*

THE bill in this cause was filed by the assignees of the late Daniel D. Tompkins, under a voluntary deed of assignment made the fifteenth day of January one thousand eight hundred and twenty-two, conjointly with the trustees appointed to subscribe for stock of the Fulton Bank in the city of New York on his account, under the eleventh section of the act incorporating the bank, passed first of April one thousand eight hundred and twenty-four. The creditors of the estate were made defendants; and the bill prayed that the accounts of the complainants might be taken and settled, the trusts closed so far as regarded them, and that they might be discharged.

By an order made on the sixth day of March one thousand

eight hundred and twenty-eight, a reference was had to a master to take an account touching the trust funds arising in favor of Daniel D. Tompkins' estate under the bank charter; and likewise, the accounts of the defendants Richard Riker, Gilbert L. Thompson and others, as creditors, with the administrators of the estate of Governor Tompkins, in order to have a dividend made of the funds remaining in the hands of the complainants.

1831.

PIERSON
v.
THOMPSON.

On the fifteenth day of March one thousand eight hundred and thirty-one the master made a report, in which he stated, that there remained in the hands of such of the complainants as were assignees under the assignment of January one thousand eight hundred and twenty-two, a balance of four thousand three hundred and twenty-six dollars and eighty-one cents; and in the hands of such of the complainants as were trustees under the bank charter a balance in favor of that trust of six thousand six hundred and ninety-two dollars and sixty-four cents.

The report also set forth the debts due to creditors; and, among the rest a debt due to Caleb T. Ward, one of the complainants, being the balance of an account and amounting to eight hundred and forty dollars. It is also stated there was, from the trust estate and in the hands of the defendant George W. Tompkins, two hundred and fifty-one dollars belonging to the trust estate under the assignment.

The other facts in the case necessary to be known in order to understand the matter sufficiently, will be found in the opinion of the court.

Mr. *H. W. Warner*, for the complainants.

Mr. *W. Kent*, for G. W. Tompkins.

Mr. *R. Riker*, in person and for his co-defendants who were creditors.

THE VICE-CHANCELLOR. A number of exceptions have been taken to the master's report in this case and upon which

*March 5.*

the cause has been heard. I shall now proceed to consider them in their order.

The first is an exception taken by Thomas Hulme, one of the complainants, to so much of the report as charges the assignees (of whom he is one) with sums of money received by him at different times, amounting to six thousand two hundred and fifty dollars or thereabouts, for rents and purchase money of certain lands on Staten Island, the title whereof was formerly in him and which moneys he claims of right to belong to him personally and not as an assignee. The master has charged these moneys as so much to be accounted for by the assignees, upon admissions contained in the complainant's bill to the following effect: that, in buying the lands on Staten Island which had been mortgaged by Tompkins to Mr. Hulme and sold under a decree of foreclosure in May, one thousand eight hundred and twenty-two, he, Mr. Hulme, had no other design than to secure as much as possible of the debt due to him; and, as the price at which he had bought in the property was considered to be less than the real value, he, in November, one thousand eight hundred and twenty-five, voluntarily exposed it to a resale at auction for the benefit of the trust estate as well as with intent and for the express purpose of appropriating to the trust estate, by way of gift or donation, any surplus produced by such resale over the principal and interest of the previous purchase by him; and, if it should sell for less, the trust estate was in no event to sustain the loss. But, it also appears he exposed the premises to such further sale, upon the distinct consideration, that all necessary and proper charges and expenses to which he had been or might be put in attending upon or managing the concerns of the trust estate should be freely allowed and paid to him in the adjustment of his accounts. He admits that, upon such resale, the property yielded a large excess which was to go to the benefit of the trust estate. ·

Taking this admission in connection with the circumstances disclosed in evidence, it appears to me to be binding upon Mr. Hulme, and fully to justify the master's report in this particular. At the time of the sale under his mortgage, he was a trustee of the equity of redemption in the property sold, and, although

he may have had a right to sell, yet, from the relation in which he stood, it is questionable whether he could divest himself of the character of trustee, so as to purchase and acquire an absolute title to himself. He bought in the property at two thousand seven hundred dollars, and afterwards sold it for considerably more than double that sum. He frankly declares the resale was for the benefit of the trust estate ; and to show, that he and his co-assignees considered the whole proceeds upon the resale, as well as the income from the property, as trust funds in their hands, they credited the amounts in their account with the estate which they filed in the master's office, as the basis whereon he was to proceed in stating the account.

After this, I do not see how Mr. Hulme can be permitted to retract. If it is to be regarded as a gift, it seems to me it was by this act consummated : for, after crediting the amount as trust funds not in the hands of Mr. Hulme only, but as so much in the hands or under the controul of all the assignees, it must be considered appropriated and transferred to and vested in them and no longer the individual property of the former, resting upon his will to carry the intention of a gift into effect or not. Besides, in another part of the bill, there is a distinct admission of Mr. Hulme's having been recently paid off in full out of the trust estate. No injustice, therefore, is done by holding him to the admission that the proceeds of the property in question were to go to the credit of the trust estate.

I shall, on this account, overrule the exception taken by the complainant Hulme to the master's report.

The next exception is taken by Caleb T. Ward, another of the complainants. The report states a balance to be due to him as a creditor, from the trust estate, of eight hundred and forty dollars, whereas, the true balance, he insists, from the proofs before the master, is two thousand and one hundred dollars and upwards. No counsel appeared to argue this exception on behalf of Mr. Ward. I have, nevertheless, looked into it carefully, and with a view to ascertain upon what foundation the exception rests. I am at a loss to discover from any part of the testimony reported by the master, a ground for the exception; and it consequently must be overruled.

The next exception to be noticed is the one taken by the defendant George W. Tompkins in relation to the sum of two hundred and fifty-one dollars reported as being in his hands and belonging to the trust estate under the assignment of January one thousand eight hundred and twenty-two. This sum was produced by a sheriff's sale of the equity of redemption of certain lands in Schoharie, which had belonged to Governor Tompkins and were included in the assignment. The sale was made under an execution issued upon a judgment in favor of Mr. Hulme or of which he had the controul and his debt being otherwise satisfied the money found its way into the hands of George W. Tompkins who claims to hold it as administrator.

At the close of the argument of this exception, I expressed an opinion, which, upon reflection, I have seen no reason to change: that the money rightfully belongs to the assignees. It was the proceeds of an interest in real estate conveyed to them; and, when the judgment creditor, in whose behalf the property was sold, ceased to claim it, although it had then become personal property, yet, I think in equity, as between the assignees and Governor Tompkins or his administrator, it is to be considered as land and should follow the destination given to it by the assignment. The master's report is, therefore, correct on this point, and the exception must be overruled.

I come now to the more important parts of this case, both in principle and amount. I allude to the exceptions presented by the defendant Richard Riker. The first relates to the sum of four thousand two hundred and eighty-eight dollars, allowed by the master to the assignees under the deed of January one thousand eight hundred and twenty-two, for moneys expended by them in two suits of assault and battery brought against Mr. Hulme and in costs and counsel fees generally; and which, it is alleged, ought not to be charged against the trust fund.

Governor Tompkins, being largely indebted to Mr. Hulme by bond and upon a mortgage of his interest in the Richmond turnpike and steamboat, and ferry connected with it, on the eighth of June one thousand eight hundred and twenty-one executed to him an assignment or transfer vesting him with apparent absolute ownership of the whole property; but, at

the same time, taking from Mr. Hulme an instrument in writing, declaring the purposes of the tranfer to be, that he, Mr. Hulme, was to hold the property for two years and six months without selling it, during which time Governor Tompkins was to have the right of demanding a reconveyance on paying the principal and interest of the bonds and all moneys with the interest which Mr. Hulme might pay to redeem any part or parts of the property previously pledged and all disbursements and expenses reasonably to be incurred by him under the assignment. And, during the term specified, Mr. Hulme was to give his personal and diligent attention to the interests connected with the property and the promotion of its value. Under this arrangement, Mr. Hulme took upon himself the controul and management of the business of the steamboat, ferry and turnpike; devoted his time and attention personally to the business; and stood in this relation to the property when the assignment of the fifteenth of January one thousand eight hundred and twenty-two was made. Being one of the assignees in the latter deed and his right previously acquired being preserved to him by an express provision, he continued to act as he had previously done, especially in the management of the ferry and its concerns. While thus acting, and, as he supposed, in the discharge of his duty, he used some personal violence towards two individuals on different occasions, putting them out of the boat or driving them from the wharf, for which he was sued in actions of assault and battery. In one of these, there was a recovery of two hundred dollars; and in the other seventy-five dollars, which, with costs, amounted in all to about six hundred and twenty-one dollars. This sum, it is contended, ought not to be taken out of the trust funds, being the consequence of his acts as a wrong doer, and, therefore, to be borne by himself. The evidence before the master by no means shows they were wanton and unprovoked acts, but the contrary; and yet, in the exercise of his authority as an agent or as owner *pro hac vice* of the property under his charge, he stepped beyond the bounds of strict legal right and became a trespasser.

The verdicts against him are conclusive on the point. Is he

28

then entitled to an indemnity? The rule holds in equity, as well as at law, that there shall be no right of contribution between joint wrong doers. This rule is founded in public policy and intended to check the disposition to combine in committing wrongs: by declaring, that each individual concerned is liable to bear the whole loss or damage which may be occasioned, see *Peck* v. *Ellis, 2 John. Ch. R.* 131; and it appears to be equally against the policy of the law that a servant or an agent who commits a trespass should entertain even the hope of protection and indemnity from his employer.

If he does the act ignorantly, upon an express promise of indemnity, the indemnity may be enforced: *Fletcher* v. *Harcott, Hutton's Reports,* 55; but where the party to whom the promise or obligation is made, knows it to be unlawful, or if his situation necessarily imposes upon him a consciousness that the act is so, neither an express promise nor even a bond to indemnify against the consequences of unlawful acts to be committed can ever be enforced at law: *Martyn* v. *Blythman, Yelv.* 197. In *Farebrother* v. *Ansley,* 1 *Camp.* 343, which was an action by an auctioneer against a sheriff upon an implied promise to indemnify him in the sale of certain goods taken in execution, and where a recovery in trespass had been had against the auctioneer, *Lord Ellenborough* is reported to have held, upon the principle that contribution was not to be enforced among joint wrong doers, that even supposing the plaintiff had been employed by the defendant to sell the goods, it did not follow he was bound to indemnify him, since a promise of indemnity was not to be implied if one man committed a trespass at the request of another. I am at a loss to perceive upon what ground or principle Mr. Hulme has a right to this indemnity out of the trust estate.

The policy of the law, which is to be enforced here as well as elsewhere, is against him. It is true, he is to be repaid "all "his disbursements and expenses reasonably to be incurred;" and the assignees under the deed of January one thousand eight hundred and twenty-two are to reimburse themselves any moneys which they may expend for the security and benefit of the trust property: but, it would be going too far to say dama-

ges and costs recovered in actions of assault and battery are within the scope and object of these terms. If it was necessary to resort to force for the protection or security of the property, I must presume such force could have been justified upon the trials at law. Although the conduct of Mr. Hulme generally appears in the most meritorious light, yet I feel myself forced to the conclusion, that the money which he has been obliged to pay in these cases cannot be taken out of the trust funds, and that the master's report in this respect is erroneous. But, as regards the residue of the amount embraced in this exception, made up of costs and counsel fees in various suits, there is not enough shown to enable me to pass upon them with any degree of certainty ; and, it is admitted there must be a further reference on the subject. I shall send it back to the master, to make a more particular report of the costs and counsel fees properly chargeable against the trust estate.

The second of these exceptions relates to two hundred acres of land on Staten Island, not credited or brought into the accounts at the time of the reference, because the lands were then a subject of controversy in another suit. Since the making of the report, it has been decided that they belong to the trust estate under the deed of assignment; and the assignees have, therefore, to account for the avails: for which purpose the parties must go before the master again.

The third exception is, that the master has allowed to the complainants Hyatt, Smith and Swift, in their accounts with the trust estate under the Fulton Bank charter, each the sum of one thousand and eighty-three dollars and thirty-three cents, being a commission of two and a half per cent. on one hundred and thirty thousand dollars of Fulton Bank stock. It was an express condition of the charter, that these three persons should subscribe, in trust for Governor Tompkins, to the capital stock of the bank the sum of one hundred and fifty thousand dollars, this being the amount of the capital stock of the Richmond Turnpike Company; and that, in payment of the subscription, they should assign and transfer to the Fulton Bank, under the common seal of the Turnpike Company, by the consent of its president and directors, all the rights, privileges, property and

estate of the company, which should thereupon be invested in the Fulton Bank; and Hyatt, Smith and Swift were to hold the stock of the bank, so subscribed for, upon such uses and trusts as Governor Tompkins should appoint and declare by writing under his hand and seal. In pursuance of this authority and condition, they subscribed for the stock; and immediately afterwards, procured the consent of the Richmond Turnpike Company to the transfer. So far as this service was performed and for any thing further which might be required of them as trustees of the stock to carry into effect the provisions of the charter, they were not entitled to any compensation by way of commissions or otherwise. The law had not provided any; nor did they stipulate for compensation previous to entering upon the duties of their trust. The discharge of the duty is, therefore, to be regarded as a voluntary courtesy. Indeed, the counsel has not urged the claim for commissions as due to them in their capacity of trustees under the bank charter; nor have the assignees under the deed of assignment claimed any commission: but, it is insisted, that, to the character of trustees, was superadded that of special agents of Governor Tompkins and in consequence of which they are entitled to charge and receive the compensation. It is true that, by an instrument in writing of the third of May one thousand eight hundred and twenty-four Governor Tompkins constituted Messrs. Hyatt, Smith and Swift his attorneys, with full power to subscribe for the one hundred and fifty thousand dollars of stock in trust for him. This instrument also states that, inasmuch as it might be necessary (in order to enable them to transfer the stock of the Turnpike Company to the bank) to pay off and discharge certain debts and demands for which the turnpike stock or some parts thereof had been pledged by him, therefore he authorized and directed them to pay off, discharge and settle all the demands for which the stock or any part of it might be pledged and any other debt or demands which might be existing against him in relation to the Turnpike Company, so as to invest the Fulton Bank with a full and entire title to the property of that company. Now, if this imposed upon them any new duties which they have performed beyond or out

of the trust as originally declared, it is clear they are entitled to charge for the service upon the ground of a *quantum meruit*. But, I do not perceive it created any new or extra duty for them to perform. By the law itself, they were first to subscribe for the stock in trust. The power of attorney only repeats what is thus declared. Next, they were to procure the assent of the Turnpike Company to the transfer; and were then to make it. In order to enable them to do this, it was necessary to relieve some portion of the property from the incumbrances upon it; and Governor Tompkins authorises and directs them to do so. And lastly, after the transfer was made, they were to hold the bank stock in trust to such uses as he should appoint and declare by writing under his hand and seal, &c. He did but appoint the use as to a part of the bank stock, when he directed that they should pay off and discharge the debts existing against him relating to the Turnpike Company or for which any part of that company's stock was pledged. I, therefore, think, that in following the directions of the power of attorney which he thought proper to give and which was a necessary document for some of the purposes, though not for all, expressed in it, the trustees were doing nothing more than what they took upon themselves to perform under the trust and authority conferred by the section of the bank charter appointing them such trustees. If I am right in this conclusion, there is no foundation for the charge of commissions allowed by the master nor for a compensation in any shape to the trustees for their trouble and services: *Brocksopp* v. *Barnes*, 5 *Mad.* 90.

The fourth exception is important in respect to the amount involved and also as regards the degree of rigour with which trustees are to be visited. The exception states, that the master hath not credited the trust fund arising under the Fulton Bank charter with the true amount of one hundred and fifty thousand dollars and the advance thereon; but only with the sum of ninety-nine thousand seven hundred and fifty-eight dollars; and it is insisted, under this exception, that the complainants are bound to account satisfactorily for the difference and make good any deficiency.

It appears, the trustees subscribed, in pursuance of the con-

dition of the bank charter, to the one hundred and fifty thousand dollars of stock, and in May one thousand eight hundred and twenty-four procured the transfer of the Richmond Turnpike Company to the bank as before mentioned ; and, therefore, took out the scrip or certificate for fifteen hundred shares of the capital stock of the bank, that being the amount at one hundred dollars per share. Governor Tompkins having been almost the sole proprietor of the Richmond Turnpike, and all his right and interest in that property having passed by the assignment of January one thousand eight hundred and twenty-two, the assignees under the assignment claimed, of course, the avails of the stock in the hands of the trustees, as vesting of right in them, subject to the trusts specified in the deed of assignment; and they forbade the appropriation of the proceeds to any other purposes. In this manner the assignees became identified with the trustees of the bank stock. Afterwards, a difficulty arose between the trustees and assignees and persons acting ostensibly on behalf of the bank, which finally resulted in an adjustment and settlement made in January one thousand eight hundred and twenty-five, by which the former gave up or relinquished twenty thousand dollars of the bank stock, surrendering the scrip they held for fifteen hundred shares and taking out new certificates for thirteen hundred. The bank then and not before commenced operations in business.

It is now sought, in behalf of the creditors entitled to come in under the assignment, to make the assignees and trustees liable for the twenty thousand dollars thus relinquished.

Whether they are liable or not depends upon the particular circumstances of the case, the expediency of the measure and the *bona fides* of their conduct.

It appears, that after the stock was subscribed for, a claim was made, by those having the controul of the affairs of the bank, for a deduction, upon the ground of a large deficiency in the property of the Richmond Turnpike Company. Although the trustees held the scrip which had been issued, they were prevented from making any transfer on the books of the bank; and were repeatedly told they should not be permitted to make any use of the stock until the claim was satisfactorily adjusted.

1831.

PIERSON
v.
THOMPSON.

After a suspension of the operations of the bank, from May one thousand eight hundred and twenty-four to January one thousand eight hundred and twenty-five, occasioned by this controversy, resort was had to negociation. Governor Tompkins appointed three of his friends to meet a committee acting or assuming to act on the part of the bank. After several interviews, it became apparent that, as a matter of policy, it was best for Governor Tompkins and most conducive to the interests of his estate, that the demand which had been lessened from what it was when first made to twenty thousand dollars, should be acceded to. Although it was put forward on the ground of a deficiency in the Turnpike property and upon investigation such deficiency did not appear to amount to more than seven thousand or eight thousand dollars, yet, there were other matters connected with the obtaining of the charter, which, there was reason to apprehend might jeopardize and perhaps prostrate the great end they had in view of providing a market for the sale of the Richmond Turnpike, should an exposure take place, and which a resort to coercive means would naturally produce. Prudence therefore dictated the propriety of a compromise, lest the opportunity should fail of realizing any thing like that amount for the Turnpike property; and Governor Tompkins finally, though reluctantly, yielded to the relinquishment of two hundred shares of the stock, equal to twenty thousand dollars; and gave authority in writing to his trustees to make the transfer to that amount to William P. Rathbone, one of the committee and the principal actor in the matter. The transfer was accordingly made by two of the trustees (Mr. Smith declined acting with them until better advised.) Immediately thereupon, he and the other assignees took advice upon the subject: whether they could safely accede to the settlement? A case was prepared for the opinion of counsel upon the facts as they understood them to exist; and, upon opinions thus obtained, they finally gave their assent to the relinquishment and transfer of the twenty thousand dollars of stock.

It is true the opinion and advice of counsel, under which

they acted, proceeds upon the assumption, that the reduction of twenty thousand dollars was claimed by the bank solely on the ground of the deficiency before spoken of, and the other circumstances appear to have been studiously kept out of view; but, there is nothing to show that the assignees were otherwise informed upon the subject or were at all privy to such concealment. It is very certain that throughout both the trustees and assignees have acted with the most entire good faith in relation to this point; and judging from the circumstances disclosed in the evidence taken before the master, I entertain no doubt of the policy and expediency, in a pecuniary point of view, of the settlement which was thus made. It put the assignees in possession of one hundred and thirty thousand dollars of available property to be applied to the payment of Governor Tompkins' debts, which might not otherwise have been obtained, and which, at the time, was supposed to be sufficient to discharge them all. The remainder was considered a sacrifice on the part of that unfortunate but distinguished individual; but, it was a sacrifice his own peculiar situation and the force of circumstances seemed imperiously to require. If, then, it was a settlement deemed expedient at the time, about which there can be no doubt from the facts now disclosed, and was entered into on the part of the complainants in good faith, acting, as they did, deliberately and under the advice of counsel, it appears to me they cannot be made liable for the loss. Trustees acting in this manner are always treated with great tenderness and liberality, lest competent and honest men should be deterred from taking upon themselves these necessary offices.

The principles upon which this court acts with regard to the subject and some of the cases are stated and referred to in *Thompson* v. *Brown*, 4 *John. Ch. R.* 619; to which I will add, as having a bearing upon this point, the case of the *Attorney General* v. *the Corporation of Exeter*, 2 *Russ.* 45, where it was held, that, if trustees of a charity, in the administration of the funds, act honestly, though erroneously, they will not be charged in respect of past misapplication of the funds.

From all these considerations, I must overrule the defendant's

fourth exception, so far as it relates to the two hundred shares or twenty thousand dollars of stock. But the exception goes further, since the trustees have brought into the account something short of one hundred thousand out of one hundred and thirty thousand dollars. They have, however, satisfactorily shown, that the balance has been applied in discharge of prior liens or incumbrances which could not be avoided. The whole exception must be overruled.

The fifth and remaining exception relates to the amount of sixty-nine thousand seven hundred and twenty-eight dollars, charged in the accounts as having been paid to Thomas Hulme, when, it is alleged, there was not due to him, at the utmost, more than sixty-three thousand five hundred and twenty-five dollars. No account has been taken of the moneys due to Mr. Hulme as a creditor, so as to ascertain whether he has been overpaid; and, until such account is taken, it is impossible to determine the question presented by this exception. It is a matter which must undergo an examination in the master's office; and, for this purpose, I shall refer it.

An order must be entered in conformity with the views I have here expressed. The question of costs and all further directions are reserved.